IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KRISTIE GOREY                          :         CIVIL ACTION
                                       :
        v.                             :
                                       :
CARPENTERS JOINT APPRENTICE            :
COMMITTEE, et al.                      :         NO. 08-5993

MEMORANDUM AND ORDER

McLaughlin, J.                                   April 27, 2010

        The plaintiff was terminated from a carpenter's

apprentice program operated by the defendant Carpenters Joint

Apprentice Committee (the "CJAC").  The defendants allege that

she was terminated due to her poor attendance record and failure

to follow the program's rules and regulations.  The plaintiff

alleges that she was terminated because she was pregnant and

because of her history of drug addiction.  She brings claims of

pregnancy discrimination under Title VII and the Pennsylvania

Human Relations Act (the "PHRA"), and claims of discrimination

based on her previous drug addiction under the Americans with

Disabilities Act (the "ADA").

        In addition to the CJAC, the plaintiff also brings her

claims against the Metropolitan Regional Council of Carpenters,

Southeastern Pennsylvania, State of Delaware and Eastern Shore of

Maryland, United Brotherhood of Carpenters and Joiners of America

(the "MRC") and the Carpenters Apprentice School of Philadelphia

and Vicinity (the "CASPV"). The plaintiff, however, agreed to withdraw her claims against the CASPV upon the defendants' representation that the CASPV is not a separate legal entity.

The defendants filed a motion for partial summary judgment. They seek summary judgment for the MRC on the grounds that (1) the plaintiff failed to exhaust her administrative remedies against the MRC, and (2) in the alternative, the plaintiff has failed to produce evidence of discrimination by the MRC. The defendants also seek summary judgment for all of the defendants on the plaintiff's pregnancy discrimination claims.

The Court grants summary judgment for the MRC on all counts. The Court rejects the plaintiff's argument that the CJAC and the MRC should be considered a single entity for exhaustion purposes. The Court, therefore, concludes that the plaintiff's exhaustion of her remedies against the CJAC does not also serve as an exhaustion of her remedies against the MRC.

Summary judgment is also granted for the remaining defendant, the CJAC, on the plaintiff's pregnancy discrimination claims. The plaintiff has not met her burden to show that the CJAC's articulated reasons for her termination were pretext for intentional discrimination on the basis of her pregnancy.

I.    The Summary Judgment Record

        The Court will begin its discussion of the summary
judgment record by describing the MRC and the CJAC and the
relationship between the two entities.  The Court then discusses
Ms. Gorey's history at the CJAC and concludes by discussing the
details of Ms. Gorey's discontinuance from the CJAC's program.


        A.    The Relationship Between the MRC and the CJAC

        The MRC is an unincorporated labor union located in
Philadelphia, PA.  The MRC functions as a chartered council of
the United Brotherhood of Carpenters and is comprised of 17 local
unions.  One of the MRC's main functions is to negotiate the
terms and conditions of employment for its local unions with
certain employers or contractor associations.  Individual union
members do not join the MRC.  Instead, they are members of their
local unions, and those local unions are affiliated with the MRC.
The union members pay their union dues to the local unions, not
the MRC.  Edward Coryell, Sr., is the MRC's Executive Secretary-
Treasurer and Business Manager.  His duties include servicing the
membership, handling grievances, overseeing the budget and paying
the staff.

        The CJAC is a labor-management group composed of
representatives from the MRC and the General Building
Contractor's Association (the "GBCA").  The CJAC trains carpenter

apprentices to become journeyman carpenters through classroom and hands-on instruction.

The CJAC is funded by a trust fund administered under Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). The trust was formed by the MRC and GBCA. The CJAC and the MRC share no fiduciary connection. With the exception of government funding, the trust is funded exclusively by contributions from the employers who contract with the MRC. Those employer contractors are required to contribute to the fund forty-five cents for every man hour worked by an apprentice employee. The CJAC owns its own building, and it maintains its own insurance policies, bank accounts and payroll. The CJAC and MRC share no common employees.

The CJAC has a committee comprised of ten "labor side" members drawn from by the MRC and ten "management side" members supplied by the GBCA contractors. Mr. Coryell serves as the co-chairman of the committee's labor side. James Clemens serves as the co-chairman of the committee's management side. The two co-chairmen share equal authority, and each co-chairman appoints the remaining nine committee members from his respective sides.

The CJAC runs a training center for carpentry and related crafts in Philadelphia. The center almost exclusively

trains MRC affiliated apprentices and journeymen.[1]  The CJAC's
program lasts four years, during which the apprentices work four
days a week and attend the school on the fifth day.  To enter the
program, applicants must complete an application and pass an
exam.  After an applicant passes the exam, he is required to
secure a sponsor in order to enter the program.  The MRC,
however, makes no recommendations to the CJAC as to the
curriculum or length of the program.

        The CJAC employs a director whose job functions include
all components of the running of the CJAC.  This includes
determining whether an apprentice will be discontinued from the
program.  All managerial decisions at the CJAC are the province
of either the CJAC's director or the committee.  Joseph Durkin
formerly served as the CJAC's director.  He retired in the summer
of 2007.  Charles Brock, Mr. Durkin's replacement, began as the
CJAC's director on August 6, 2007.


        B.    Ms. Gorey's History at the CJAC

        Ms. Gorey enrolled in the CJAC in the Fall of 2003.
She was sponsored by Penn Acoustics.  On December 3, 2003, Penn
Acoustics terminated Ms. Gorey for tardiness and poor attendance.

--------

[1]     The CJAC does occasionally train non-MRC affiliated
tradespersons such as pipefitters or glazers.  Such occurrences,
however, are rare.

Because Ms. Gorey lost her sponsorship, she was forced to cease participation in the CJAC's program.

Ms. Gorey re-enrolled in the program in October 2004 and began her first year apprenticeship for the second time. Ms. Gorey missed her first day of class and was absent for five of the next twelve classes. Before her second absence, Ms. Gorey was called to James Brennan's office. Mr. Brennan was the assistant director of the CJAC at the time. He gave Ms. Gorey a "verbal warning" concerning getting to class on time.

After several other absences, Ms. Gorey met with Mr. Durkin on April 25, 2005, and was given one last chance to attend classes. Because her attendance record foreclosed the possibility of her graduating to the second year, Mr. Durkin permitted Ms. Gorey to drop out of the first year program and re-enroll for the fall 2005 semester.

Ms. Gorey began the first year of the apprentice program for a third time in October 2005. Ms. Gorey was absent from the first day of classes. She was absent for five out of twenty-four classes and was late to another four classes.

Because of her attendance record, Ms. Gorey was placed on probation on January 17, 2006. As part of the probation process, Ms. Gorey signed an acknowledgment stating that (1) her failure to make immediate progress may be considered in determining whether reasonable suspicion existed regarding

possible drug use, and (2) any continued failure to comply with the CJAC's rules and regulations would result in further corrective actions, including the discontinuance of her apprenticeship. The form contained the following remarks: "Absent twice and late once in first 3 days. Poor report from jobs. If improve [sic] is not immediate apprenticeship will end." Notice of Probation Dated January 17, 2006, attached as Ex. 6 to the defendants' Motion for Partial Summary Judgment ("Def. Mot.").

Ms. Gorey signed another probationary acknowledgment form on August 10, 2006. This form contained the following remarks: "Has poor attendance & low work hours STILL. In 2nd year dock 4 days pay for each day missed over one." Notice of Probation Dated August 10, 2006, attached as Ex. 7 to Def. Mot.

Ms. Gorey began the second year of the program in the fall of 2006. In that year, Ms. Gorey's fourth with the CJAC, Ms. Gorey was marked absent from four of eight classes. She met with Mr. Brennan again on January 17, 2007, and he presented a third probationary acknowledgment form. The form contained the following remarks: "Last & final chance. Miss one more day for any reason and apprenticeship ends." Notice of Probation Dated January 17, 2007, attached as Ex. 8 to Def. Mot. Ms. Gorey missed two more classes after that warning.

On March 7, 2007, Ms. Gorey's last day before completing year two, Ms. Gorey was removed from class by her instructor and taken to Mr. Durkin's office. Mr. Durkin testified that she appeared to be in "very bad shape" and looked "high." Transcript of Deposition of Joseph Durkin at 32 ("Durkin Dep."), attached as Ex. 13 to Def. Mot. Ms. Gorey admitted that she was high on drugs and alcohol. She was sent home and never completed year two.

Mr. Durkin told Ms. Gorey that, if she successfully attended and completed a drug rehabilitation program, she could repeat her second year but would be required to submit to regular drug screenings. Ms. Gorey met with Mr. Durkin on June 5, 2007. She gave him a letter from Livengrin, a drug rehabilitation facility, stating that she had been receiving treatment and could return to work. Mr. Durkin permitted Ms. Gorey to return to work and made an entry on her file card that read, "Met with Kristie – is still receiving counseling – should be going back to work – Repeat 2nd year – early Fall class – drug test in summer – Freeze Rate at 4th period – until further notice." Copy of File Card, attached as Ex. H to plaintiff's opposition brief ("Pl. Opp'n"). Ms. Gorey returned to work and incurred no further disciplinary action that summer.

C.    Ms. Gorey's Termination

Mr. Brock started as the director of the CJAC on August 6, 2007.  He met with Mr. Brennan to review the files of some "problem apprentices."  Ms. Gorey was one of those apprentices.

Ms. Gorey states that she called and left a message with a CJAC secretary on August 20, 2007.  The secretary made a note of the call that reads, "[Ms. Gorey] is pregnant.  Can she come to school throughout the year?"  Note of August 20, 2007, Phone Message, attached as Ex. F to Pl. Opp'n.  The secretary's note was placed in Ms. Gorey's file.

Some time later, Mr. Brock reviewed Ms. Gorey's file. Mr. Brock states that he did not see the note concerning Ms. Gorey's pregnancy because he did not review her entire file. Instead, he testified that he reviewed only those portions of the file that concerned attendance, work hours and any complaints or calls the CJAC had received from her employers.  Mr. Brock specifically recalls examining the following: the letter from Penn Acoustic; Ms. Gorey's file card; a document recounting the incident of March 7, 2007; and Ms. Gorey's notices of probation. Transcript of Deposition of Charles Brock at 16-17, 20-24, 63 ("Brock Dep."), attached as Ex. 15 to Def. Mot.

Mr. Brock also discussed Ms. Gorey's record with Mr. Brennan.  During the discussion, Mr. Brennan stated that, if he

had been in charge, Ms. Gorey would have been discontinued from the program previously.

Mr. Brock decided to discontinue Ms. Gorey from the program. He stated that he discontinued Ms. Gorey because of her poor attendance record, reports of complaints from contractors, and the fact Ms. Gorey had attended the program for four years and still had not completed the program's second year. Mr. Brock stated that his decision was also influenced by the fact that Ms. Gorey's probationary acknowledgment from January 17, 2007, contained the warning that if she missed one more day, for any reason, she would be discontinued. She had missed two days after that date. Mr. Brock also stated that he was generally discontinuing apprentices that were not following the CJAC's rules and regulations.

Mr. Brock advised Ms. Gorey of her discontinuance by a letter dated August 28, 2007. The MRC was copied on the letter. The letter states that "[t]he Financial Secretary of your Local Union is hereby advised to discontinue accepting any further dues payments from you and to drop your name from the membership roles." Discontinuance Letter, attached as Ex. 9 to Def. Mot. Mr. Brock testified that the discontinuance letter was a form letter used by the CJAC before his arrival. He has since removed that language from the letter.

Ms. Gorey telephoned Mr. Brock shortly after receiving the letter. Mr. Brock informed Ms. Gorey that she was being discontinued from the program because of her disciplinary history. Mr. Brock made no mention of Ms. Gorey's pregnancy during the phone call and nothing in the conversation led Ms. Gorey to believe that Mr. Brock knew she was pregnant.

Ms. Gorey also attempted to reach Mr. Coryell by telephone. Ms. Gorey testified that Mr. Coryell did not return her calls and, instead, "relayed a message" through his secretary that "the MRC had to stand behind whatever decisions that the CJAC made." Transcript of Deposition of Kristie Gorey at 137-39 ("Gorey Dep."), attached as Ex. A to Pl. Opp'n. Ms. Gorey also called the business agent of her local union, Gerry Coughlin. Ms. Gorey testified that Mr. Couglin contacted her a short time later and said that "Mr. Brock is sticking by his decision." Id. at 162.

Mr. Brock had discontinued another apprentice on August 10, 2008. He discontinued another apprentice two days after Ms. Gorey. He discontinued 28 apprentices, including Ms. Gorey, during his first five months and discontinued 101 apprentices from August 10, 2007, to February 2, 2010. Mr. Brock does not know if any of those individuals were permitted to remain with the MRC. Mr. Brock, however, did provide the names of eight

pregnant apprentices who successfully participated in the CJAC's program.

According to Ms. Gorey's record with the MRC, she was removed from the MRC's rolls on March 31, 2008, six months after she was discontinued from the CJAC.

## II. Analysis

The Court first analyzes whether the plaintiff exhausted her administrative remedies against the MRC.  That issue turns on the question of whether the CJAC and the MRC should be considered to be a single employer such that Ms. Gorey's exhaustion of remedies against the CJAC may also be considered exhaustion against the MRC.  After concluding that the CJAC and the MRC should not be considered a single entity and that the plaintiff did not exhaust her remedies against the MRC, the Court then discusses whether summary judgment should be granted for the remaining defendant, the CJAC, on the plaintiff's claims of pregnancy discrimination.

### A.  Exhaustion of Remedies Against the MRC

An employee may bring an employment discrimination claim under Title VII or the PHRA only after filing a timely charge with the Equal Employment Opportunity Commission ("EEOC") or comparable state agency.  42 U.S.C. § 2000e-5; see also

<u>Waiters v. Parsons</u>, 729 F.3d 233, 237 (3d Cir. 1984).  In order to bring suit against an employer under the ADA, a plaintiff must follow the administrative procedures set forth in Title VII.  42 U.S.C. § 12117; <u>see also</u> <u>Churchill v. Star Enterprises</u>, 183 F.3d 184, 190 (3d Cir. 1999).  An employee may bring claims only against a party named as a respondent in the administrative action.  42 U.S.C. § 2000e-5(f)(1); <u>see also</u> <u>Schafer v. Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh</u>, 903 F.2d 243, 252 (3d Cir. 1990).

The plaintiff filed an EEOC charge against the CJAC but never filed a charge against the MRC.  She argues, however, that the MRC and the CJAC should be considered a single employer for exhaustion purposes.[2]  To determine whether the MRC and the CJAC should be considered to be a single employer, the parties agree that the Court should apply the test articulated by the United

---

[2]     Whether the plaintiff has exhausted her remedies against the MRC is considered to be a substantive part of the plaintiff's claims and not a jurisdictional question.  <u>Francis v. Mineta</u>, 505 F.3d 266, 268 (3d Cir. 2007).

States Court of Appeals for the Third Circuit in <u>Nesbit v. Gears Unlimited</u>, 347 F.3d 72 (3d Cir. 2003).[3]

In <u>Nesbit</u>, the Court of Appeals held that two entities may be considered a single entity under certain circumstances. 347 F.3d at 87. One such circumstance is when the "operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." <u>Id.</u>[4] If so, a court engages in "substantive consolidation," in which the court consolidates the two entities for the purposes of satisfying Title VII's requirements. To determine whether the operations of two entities should be consolidated, a district court considers the following four factors: (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters); (2) whether they present themselves as a single company such that third parties dealt with them as one unit; (3) whether a parent company covers the

---

[3]    The Court recognizes that other tests could be used to evaluate whether the MRC and CJAC should be considered joint employers. Because the parties agreed that the <u>Nesbit</u> test should be applied, however, the Court will only consider that test for the purposes of deciding the defendants' motion.

[4]    The other two circumstances are (1) when a company splits itself into separate entities with less than fifteen employees to intentionally evade Title VII, and (2) when a parent company directs a subsidiary to do the alleged discriminatory acts. The parties do not argue that either of these situations is present in this case.

salaries, expenses or losses of its subsidiary; and (4) whether one entity does business exclusively with the other. Id.

The Court of Appeals stated that the test is an intentionally open-ended equitable inquiry that focuses on the degree of operational entanglement between the two entities. The Court of Appeals also stressed, however, that substantive consolidation is an equitable remedy that is difficult to achieve.

In Nesbit, the plaintiff alleged that her employer, Gears Unlimited, Inc. ("Gears"), terminated her employment as a machine operator because of her sex. Gears employed less than 15 people and therefore did not satisfy Title VII's 15-employee minimum. The plaintiff argued, however, that the court should also consider the employees of a related entity, Winters Performance Products ("Winters"), in determining whether Gears satisfied the statutory minimum. Applying its test, however, the Court of Appeals found that the plaintiff had provided no evidence showing that substantive consolidation made sense under the four factors.[5]

The Court of Appeals found that the plaintiff had not produced evidence to satisfy the first factor, the degree of

---

[5] The Court of Appeals concluded that there was no evidence that the company split itself into separate entities to evade Title VII or that the companies had a parent-subsidiary relationship.

15

unity between the entities with respect to ownership, management and business functions, even though there was evidence of common ownership and some coordination in hiring. The Court of Appeals did not find it significant that the owner of Winters, Mr. Vaughn, Sr., was the individual who actually fired the plaintiff from Gears. Nor did the Court of Appeals find it significant that the two companies coordinated in recruiting applicants. The Court of Appeals stated its outcome may have been different "if Gears had no say in hiring its own employees, if Gears and Winters held themselves out to job applicants as a single company, if the two companies' human resources functions was entirely integrated, and/or if they did not maintain separate payrolls." Id. at 89. None of these situations, however, was present.

The Court of Appeals applied the last three factors and found that none of them was satisfied. In the absence of more significant operational entanglement, the Court of Appeals concluded that common ownership and de minimis coordination in hiring were insufficient bases to disregard the separate corporate forms of Gears and Winters.

Applying the Nesbit factors to this case, the Court concludes that the CJAC and MRC should not be consolidated under Nesbit. Under the first Nesbit factor, there is no evidence that the CJAC and MRC share common managerial, operational or labor

16

relations.  The CJAC owns its own building and maintains its own insurance policies, bank accounts and payroll.  All managerial decisions at the CJAC are made by the CJAC's director or the CJAC's committee.  Only half of that committee is comprised of MRC members, and the other half is comprised of representatives from the employers who contract with the MRC.  The CJAC director has no authority to make any decisions or to effectuate any functions of the MRC.  Nor is there evidence of the MRC independently making decisions regarding the CJAC's curriculum or other details of the program itself.

Furthermore, the two entities share no employees and serve entirely different business functions.  The CJAC was established primarily to train apprentice carpenters.  It employs the director, a secretarial pool and other staff, and teachers.  The MRC is an employee organization which represents employees of local unions for the purposes of collective bargaining.  It employs business agents, labor organizers and other union-related employees.

The plaintiff argues, however, that the two entities share employment decisions and are therefore operationally entangled.  She argues that this entanglement is evidenced by: (1) the language in Mr. Brock's letter advising the local union to discontinue accepting further dues payments from Ms. Gorey and to take Ms. Gorey off its roles, (2) the fact that the MRC was

copied on the letter, (3) the fact that Mr. Brock could offer no examples of persons discontinued from the CJAC who were not also terminated from the MRC, and (4) the comments attributed to Mr. Coryell and Mr. Coughlin concerning the discontinuance letter.

Comparing these facts to the evidence in <u>Nesbit</u> itself, in which the fact that the individual who terminated the plaintiff was the owner of the other company was insufficient to satisfy the first <u>Nesbit</u> factor, the plaintiff's evidence is insufficient to establish operational entanglement under the first <u>Nesbit</u> factor. There is no evidence that Mr. Brock's statement in the discontinuance letter caused, much less compelled, the MRC or Ms. Gorey's local union to drop her from the union rolls. The plaintiff has presented no evidence that Mr. Brock, as the director of the CJAC, had the power to remove an apprentice from the rolls of her local union.

The plaintiff also argues that no apprentices remain on the rolls of their MRC-affiliated local unions after they have been discontinued from the CJAC's program. The plaintiff, however, bases this argument on Mr. Brock's statement that he was not aware of an apprentice that remained with the MRC after being discontinued. Such a statement does not mean that no such apprentice exists. And even if no such apprentice does exist, such evidence does not, by itself, necessarily lead to the conclusion that the CJAC has operational control over the MRC's

18

union rolls.  There is no evidence on the effect of termination from the CJAC on any of the other discontinued apprentices' status with their local unions or the MRC.

The plaintiff also relies upon the statement attributed to Mr. Coryell by his secretary that the "MRC had to stand behind whatever decisions that the CJAC made" and to Mr. Couglin's statement that "Mr. Brock was sticking to his decision" as evidence demonstrating unity between the CJAC and the MRC.  The plaintiff, however, provides no context for these statements, other than the fact that they were prompted by her telephone calls regarding the termination letter from Mr. Brock.  One cannot tell whether the "decision" referred to by either Mr. Coryell or Mr. Couglin is Mr. Brock's decision to discontinue Ms. Gorey's apprenticeship or some other decision to remove Ms. Gorey from the union roles.

Furthermore, the defendants have submitted evidence that the plaintiff was removed from the MRC's rolls approximately six months after the discontinuance letter and well after these statements were made.  The plaintiff has submitted no evidence that the MRC or her local union had made a "decision" when Ms. Gorey placed her calls.  Finally, the statement attributed to Mr. Coryell is the plaintiff's paraphrasing of a statement relayed by Mr. Coryell's secretary.  Such a statement is far too attenuated

and ambiguous to bear the weight that the plaintiff wishes to place upon it.

The plaintiff does not argue that the CJAC and MRC meet the second or third <u>Nesbit</u> factors. Nor is there evidence that the two entities present themselves as a single company such that third parties dealt with them as one unit or that they were in a parent-subsidiary relationship.

The plaintiff, however, does argue that the evidence that the CJAC's sole purpose is to train MRC members satisfies the fourth <u>Nesbit</u> factor, whether one entity does business exclusively with the other. Although the defendants point to "rare" cases in which pipefitters or glazers who are not in the MRC attended the CJAC, the CJAC almost exclusively trains apprentices from MRC-affiliated unions. Mr. Brock testified that, for an apprentice to be trained at the CJAC, the apprentice must be a member of the MRC. Based upon this evidence, a reasonable fact finder, viewing the evidence in a light most favorable to the plaintiff, could determine that the CJAC deals exclusively with the MRC.

When weighed against the evidence presented under the other three factors, however, the fact that the CJAC exclusively trains MRC-affiliated apprentices provides an insufficient basis for the conclusion that the CJAC and MRC are so united that nominal employees of one are treated interchangeably with those

of the other.[6]  Given that the factors are meant to present an

"essentially open-ended inquiry" into "an equitable remedy that

is difficult to achieve," the Court concludes that the evidence

presented by the plaintiff is insufficient to deem the MRC and

CJAC a single entity for the purposes of exhaustion.

Because the plaintiff did not exhaust her

administrative remedies as to the MRC, summary judgment is

granted for the MRC and against the plaintiff on all counts.


B.    Pregnancy Discrimination

The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k),

requires that "women affected by pregnancy and other related

conditions must be treated the same as other applicants and

employees on the basis of their ability or inability to work."

Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 364 (3d Cir.

2008).  When a plaintiff, like the plaintiff in this case, relies

on indirect evidence to establish discrimination, courts use the

burden-shifting McDonnell Douglas framework to analyze an

_____

       [6]    The plaintiff, citing to Thorpe v. Reading Hospital,
2006 WL 3196456 (E.D.Pa. Nov. 1, 2006), argues that if the CJAC
and MRC satisfy just one Nesbit factor, they should be considered
operationally entangled.  The Thorpe court, however, never stated
that the satisfaction of a single Nesbit factor was sufficient to
show operational entanglement.  In fact, although the court
discussed only the second factor in detail, the court stated that
"there is a genuine issue of material fact as to all of the
[Nesbit] factors."  Id. at *4.

employee's discrimination claims.  <u>Id.</u> (<u>citing</u> <u>McDonnell Douglas</u>
<u>Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).

Under that analysis, the employee must first establish
a <u>prima</u> <u>facie</u> case.  If the employee does so, the burden shifts
to the employer to provide a legitimate, nondiscriminatory reason
for its adverse employment decision.  If the employer is able to
do so, the burden shifts back to the employee, who must show that
the employer's articulated reason is really a pretext for
intentional discrimination.  <u>Id.</u> at 364.

Although the plaintiff in this case does establish a
<u>prima</u> <u>facie</u> case of pregnancy discrimination, she does not
provide evidence sufficient for a reasonable fact-finder to
determine that the CJAC's articulated reasons for her
discontinuance were pretext for intentional discrimination.


1.    <u>The Prima Facie Case</u>

To establish a <u>prima</u> <u>facie</u> case of pregnancy
discrimination, an employee must show (1) that she was pregnant
and her employer knew it, (2) that she was qualified for her job,
(3) that she suffered an adverse employment decision, and (4)
that there was a nexus between her pregnancy and the adverse
employment decision.  <u>Id.</u> at 365.  The Court of Appeals has
recognized that the burden for establishing a <u>prima</u> <u>facie</u> case is

not intended to be onerous and is easily met.  Id. (quoting Texas
Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

There is no dispute as to the second, third and fourth
elements of the prima facie case.  The defendants do not argue
that Ms. Gorey was not qualified to work at the apprentice
program, and there is no question that she suffered an adverse
employment decision in being discontinued from the apprentice
program.  At oral argument, the defendants also conceded that the
temporal proximity of eight days between the CJAC's first hearing
of Ms. Gorey's pregnancy and her discontinuance is sufficient to
establish the causation element of the prima facie case.
Transcript of April 9, 2010, Hearing at 46:9-15.

Under the first element of the prima facie case, the
only evidence that would support the inference that Mr. Brock
knew Ms. Gorey was pregnant is the note in her file concerning
the phone message.  Even though Mr. Brock testified that he never
saw the note and had no knowledge that Ms. Gorey was pregnant at
the time he made his decision, the Court will assume that the
evidence presented by the plaintiff is sufficient for a
reasonable fact finder to determine that the plaintiff has met
the first prong of the prima facie case.

2. <u>Pretext</u>

Although the plaintiff has established a <u>prima</u> <u>facie</u> case of discrimination, the Court concludes that the CJAC has presented legitimate, non-discriminatory reasons for Ms. Gorey's termination and that the plaintiff has not met her burden of establishing that those reasons are a pretext for improper discriminatory intent.

An employer satisfies its burden by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). This burden is "relatively light" and the employer need not prove that the tendered reason actually motivated its behavior, as the ultimate burden of proving intentional discrimination always rests with the plaintiff. <u>Id.</u>

The CJAC has met this burden. Mr. Brock stated that he decided to discontinue Ms. Gorey because: (1) she was in the program for four years and never progressed beyond year two; (2) she was present and on time for only a little over half of her classes; (3) she was let go from Penn Acoustics for absenteeism and tardiness; (4) she received poor reports from other jobs; and (5) she was absent from class twice after being given a final warning that her apprenticeship would end after one more absence.

24

These reasons provide legitimate grounds for discontinuing Ms. Gorey's apprenticeship.

Because the CJAC has satisfied its burden, the burden shifts back to Ms. Gorey to show that these reasons were merely a pretext for discrimination. To rebut an employer's proffered legitimate reasons, a plaintiff must submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that the fact finder could reasonably conclude that the reason was a fabrication, or (2) would allow the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination. Doe, 527 F.3d at 370. The plaintiff must present evidence showing "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the employer's proffered reasons such that a reasonable fact finder could rationally infer that the employer did not act for the asserted non-discriminatory reasons. Fuentes, 32 F.3d at 765.

The Court concludes that the plaintiff has not met this burden. Even assuming that a reasonable fact finder could rationally infer that Mr. Brock knew that Ms. Gorey was pregnant, the plaintiff has not met her burden to show that Mr. Brock's proffered reasons are post hoc fabrications or are implausible or fraught with contradictions or inconsistencies.

The plaintiff argues that the timing of her discontinuance provides evidence of pretext because: (1) no recent disciplinary action triggered her discontinuance, and (2) Mr. Brock discontinued her apprenticeship 8 days after she informed the CJAC of her pregnancy.[7]

Although Ms. Gorey had not incurred any disciplinary actions in the months preceding her discontinuance, her troubled history at the CJAC provided Mr. Brock with several legitimate reasons to discontinue Ms. Gorey's apprenticeship. As the director of the CJAC, Mr. Brock's decision to discontinue Ms. Gorey was within his discretion and authority. The plaintiff has produced no evidence to show that Mr. Brock was bound by the former director's decision not to discontinue Ms. Gorey or that a recent disciplinary violation was required to trigger her discontinuance. The Court also notes that the CJAC held no classes between June and August 2007. Ms. Gorey, therefore, did not have the opportunity to violate the CJAC's class attendance policies at the time, making the fact that there was no record of recent discipline even less significant.

---

[7] The plaintiff cites to several cases to argue that temporal proximity is enough, by itself, to meet her burden. See e.g., LeBoon v. Lancaster Jewish Community Ctr., 503 F.3d 217, 232 (3d Cir. 2007). The cases cited by the plaintiff, however, discuss temporal proximity in the context of the causation element of a prima facie case of retaliation, not in the context of the higher burden of establishing pretext.

Although Ms. Gorey's discontinuance did closely follow her phone call to the CJAC, the timing of Ms. Gorey's discontinuance also coincided with Mr. Brock's review of "problem apprentices" at the CJAC. Mr. Brock testified that, when he started as the director of the CJAC, he reviewed the files of certain problem apprentices with the intent to discontinue those who failed to follow the CJAC's rules and regulations. He discontinued 28 apprentices in his first five months as director, including one apprentice before Ms. Gorey and another two days after Ms. Gorey.

Ms. Gorey was one of the "problem apprentices" presented to Mr. Brock for review. Her file contained several instances of her failure to follow the CJAC's rules and regulations were documented. A review of the file, therefore, provided Mr. Brock with legitimate reasons to discontinue Ms. Gorey's apprenticeship, and he discontinued her while engaged in the practice of discontinuing such "problem apprentices."

Finally, the plaintiff presents no additional evidence of animus or disparate treatment. Mr. Brock presented the names of eight pregnant apprentices who successfully participated in the CJAC's program, and Ms. Gorey presents no evidence showing that she was treated differently from any of the other discontinued apprentices.

Viewing the discontinuance in the context of the CJAC's recent change in directors, Mr. Brock's practice of discontinuing problem apprentices and Ms. Gorey's history with the CJAC, the timing of Ms. Gorey's discontinuance does not provide evidence upon which a reasonable fact finder could conclude that Mr. Brock's articulated reasons are a <u>post hoc</u> fabrication to mask discriminatory intent, much less that discriminatory intent was the determinative factor in Mr. Brock's decision.

An appropriate order follows separately.